## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

| | |
|---|---|
| HYUNDAI STEEL COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 22-00029 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| SSAB ENTERPRISES LLC, ) | |
| ) | |
| and ) | |
| ) | |
| NUCOR CORPORATION ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |
| DONGKUK STEEL MILL CO., LTD., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 22-00032 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| NUCOR CORPORATION, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## ORDER

Upon consideration of plaintiffs' motions for judgment on the agency record, responses thereto, plaintiffs' replies, the administrative record, and all other pertinent papers, it is hereby:

ORDERED that plaintiffs' motions are DENIED; and it is further

ORDERED that the Department of Commerce's Final Results are sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated: _____

_____
New York, New York                          Judge

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE M. MILLER BAKER, JUDGE

_____

| | | |
|---|---|---|
| HYUNDAI STEEL COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 22-00029 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| SSAB ENTERPRISES LLC, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NUCOR CORPORATION | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |
| | ) | |
| DONGKUK STEEL MILL CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 22-00032 |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NUCOR CORPORATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

### DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTIONS FOR JUDGMENT UPON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, defendant, the United States, respectfully submits this response to the motions for judgment on the agency record filed by plaintiffs Hyundai Steel Company (Hyundai) and Dongkuk Steel Mill Co. Ltd. (Dongkuk) challenging the United States Department of Commerce's (Commerce) final results in the administrative review of the countervailing duty order on certain cut-to-length carbon-quality steel plate (CTL plate) from the Republic of Korea (Korea).  As explained below, the motions should be denied because Commerce's determination is supported by substantial evidence and is otherwise in accordance with law.

### STATEMENT PURSUANT TO RULE 56.2

### I.   Administrative Decision Under Review

The administrative determination under review is *Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea:  Final Results of Countervailing Duty Administrative Review; 2019*, 87 Fed. Reg. 79 (Dep't of Commerce Jan. 3, 2022) (Final Results), Appx 1076– 77, and accompanying Issues and Decision Memorandum (IDM), Appx

2

1037–75.  The period of review is January 1, 2019, through December 31, 2019.  *Id.*

## II.   Issue Presented

Whether Commerce's determination that the Korean Emission Trading System (KETS) permits constitute a countervailable subsidy is supported by substantial evidence and in accordance with law.[1]

## STATEMENT OF FACTS

On February 10, 2000, Commerce published the countervailing duty order on CTL plate from Korea.  *See Notice of Amended Final Determination:  Certain Cut-to-Length Carbon-Quality Steel Plate from India and the Republic of Korea; and Notice of Countervailing Duty Orders:  Certain Cut-to-Length Carbon-Quality Steel Plate from France, India, Indonesia, Italy, and the Republic of Korea*, 65 Fed. Reg. 6,587 (Dep't of Commerce Feb. 10, 2000) (Order).  On February 3, 2020, Commerce published a notice of opportunity to request an administrative review of the Order.  *See Antidumping or*

---

[1] Dongkuk's brief incorporates by reference all arguments and explanations in Hyundai's brief.  *See* Dongkuk Br. ECF No. 43 (Aug. 5, 2022).  Reference to arguments made by "plaintiffs" thus contemplates that Dongkuk has adopted an argument advanced by Hyundai.

*Countervailing Duty Order, Finding, or Suspended Investigation;*

*Opportunity To Request Administrative Review*, 85 Fed. Reg. 5,938

(Dep't of Commerce Feb. 3, 2020).  On February 28, 2020, Dongkuk, and

the petitioners, ArcelorMittal USA, LLC, Nucor Corporation (Nucor),

and SSAB Enterprises, LLC filed a request for review of the Order for

Hyundai and Dongkuk, as well as two additional companies.  *See*

Dongkuk Letter, "Countervailing Duty Order on Certain Cut-To-Length

Carbon-Quality Steel Plate from Korea — Request for Administrative

Review," dated February 28, 2020, Appx 14,527-28; *see also* Petitioners'

Letter, "Certain Cut-to-Length Carbon-Quality Steel Plate from the

Republic of Korea:  Request for Administrative Review," dated February

28, 2020, Appx 14,533-34; *see also* Appx. 14,530-31.

On April 8, 2020, Commerce initiated an administrative review of

the countervailing duty order on CTL plate from Korea.  *Initiation of*

*Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed.

Reg. 19,730 (Dep't Commerce Apr. 8, 2020).

On May 6, 2020, Commerce selected Hyundai Steel as the sole

mandatory respondent in this administrative review and issued initial

questionnaires to the Government of Korea (GOK) and Hyundai Steel.

4

*See* Memorandum, "Countervailing Duty Administrative Review of Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea:  Selection of Respondents for Individual Examination," dated May 6, 2020, Appx 14598-602; Commerce's Letter, "Countervailing Duty Questionnaire," dated May 7, 2020, Appx 14,603-65.

On May 28, 2020, Commerce received Hyundai Steel's affiliation questionnaire response, and on June 30, 2020, Commerce received the GOK's initial questionnaire response.  *See* Hyundai Steel's Letter, "Hyundai Steel's Affiliated Companies Questionnaire Response," dated May 28, 2020, Appx 1196; GOK's Letter, "Response to the Initial Questionnaire," dated June 30, 2020 (GOK IQR), Appx 4225-6078.

On August 17, 2020, Nucor filed two new subsidy allegations, alleging that the GOK provided carbon emissions credits as government grants and for less than adequate remuneration to electricity-generating companies and large industrial companies, such as Hyundai, during the period of review.  *See* Petitioner's Letter, "Certain Cut-To-Length Carbon-Quality Steel Plate from South Korea:  New Subsidy Allegations," (August 17, 2020), Appx 9230-39.

On September 3, 2020, Hyundai and the GOK submitted rebuttal comments.  *See* Hyundai Steel's Letter, "Certain Cut-to-Length Steel Plate from the Republic of Korea, Case No. C-580-837:  Rebuttal to Nucor's New Subsidy Allegations," dated September 3, 2020, Appx 9,738-71; GOK's Letter, "Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea:  Response to Petitioner's New Subsidy Allegations," dated September 3, 2020, Appx 9,724-36.

On March 22, 2021, Commerce issued a letter requesting additional information from Nucor concerning the two newly-alleged programs, to which Nucor responded on March 24, 2021.  *See* Commerce's Letter, "Administrative Review of the Countervailing Duty Order on Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea Subject: Supplemental Questionnaire for New Subsidy Allegations," dated March 22, 2021, Appx 14,817-19; Petitioner's Letter, "Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: New Subsidy Allegation Supplemental Questionnaire Response," dated March 24, 2021, Appx 14,820-25.  On April 26, 2021, Commerce initiated an investigation into the alleged provision of carbon emissions permits for less than adequate remuneration and issued questionnaires

relating to this program to the GOK and Hyundai Steel.  *See* Memorandum, "New Subsidy Allegations," dated April 26, 2021, Appx 15,417-37; Commerce's Letter, "New Subsidy Allegation Questionnaire," dated April 26, 2021, Appx 15,438-50.  On May 17, 2021, the GOK and Hyundai responded to Commerce's questionnaires.  *See* Hyundai Steel's Letter, "Hyundai Steel's Carbon Emissions New Subsidy Allegation Questionnaire Response," dated May 17, 2021, Appx 10,110-901; GOK's Letter, "Response to the New Subsidy Allegation Questionnaire," dated May 17, 2021, Appx 11,903-12,085.

On October 19, 2021, Commerce published its Post-Preliminary Analysis Memorandum, where Commerce determined that the provision of KETS permits constituted a countervailable subsidy. Countervailing Duty Administrative Review of Certain Cut-To-Length Carbon-Quality Steel Plate from the Republic of Korea; 2019:  Post-Preliminary Analysis Memorandum (Post-Preliminary Decision), Appx 14328-59.  Commerce published its Final Results on December 23, 2021, continuing to find the provision of KETS permits constituted a countervailable subsidy.  Final Results, Appx 1047-53.

7

# ARGUMENT

## I.  Standard Of Review

In reviewing Commerce's countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not render Commerce's findings unsupported by substantial evidence.  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and

the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions, *Alt. Sugar Ltd. v. United States*, 744 F.2d 1556, 1562-63 (Fed. Cir. 1984) (citation omitted).

Moreover, this Court affords Commerce "tremendous deference" that is "both greater than and distinct from that accorded the agency in interpreting the statutes it administers" when Commerce exercises its technical expertise to select and apply methodologies to implement the dictates of the trade statute. *Fujitsu*, 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts."); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (explaining the scope of Commerce's discretion under the antidumping statute). The Court may not overturn an agency determination "simply because the reviewing court would have reached a different conclusion based on the same record," *Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007), and the Court will not substitute its judgment for that of Commerce in choosing

9

between two fairly conflicting views, even though it could justifiably have made a different choice had the matter been before it *de novo*. *See Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006); *Timken Co. v. United States*, 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (explaining that the Court will not "weigh the adequate quality or quantity of the evidence for sufficiency").

## II.  Statutory Background

A subsidy is countervailable when an authority has provided a financial contribution to a person, a benefit is thereby conferred, and the subsidy is specific.  19 U.S.C. § 1677(5); *see also* Statement of Administrative Action, Uruguay Round Trade Agreements Act, Texts of Agreements, Implementing Bill, Statement of Administrative Action, and Required Supporting Statements, H.R. Doc. No. 301-16 (1994) (SAA), Vol. 1 at 925 (accompanying H.R. 5110, 103d Cong., 2d Sess. (1994) (enacted), reprinted in 1994 U.S.C.C.A.N 4040.  In determining whether a subsidy exists and is countervailable, Commerce evaluates three specific elements:  financial contribution, specificity, and whether a benefit was conferred.  *See* 19 U.S.C. § 1677.

The statute defines a financial contribution as:

(i) the direct transfer of funds, such as grants, loans, and equity infusions, or the potential direct transfer of funds or liabilities, such as loan guarantees,

(ii) foregoing or not collecting revenue that is otherwise due, such as granting tax credits or deductions from taxable income,

(iii) providing goods or services, other than general infrastructure, or

(iv) purchasing goods.

19 U.S.C. § 1677(5)(D). The categories of practices constituting a financial contribution are purposefully broad. SAA at 927 ("The examples of particular types of practices falling under each of the categories are not intended to be exhaustive.").

Further, the statute defines a countervailable subsidy as a subsidy that is specific. *See* 19 U.S.C. § 1677(5A). Domestic subsidies can be specific as a matter of law (*de jure*) or in fact (*de facto*). *See* 19 U.S.C. § 1677(5A)(D)(i)-(iii). A subsidy is *de jure* specific "{w}here the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry." 19 U.S.C. § 1677(5A)(D)(i). "The *de jure* prong of the specificity test recognizes that where a foreign government expressly limits access to a subsidy to a sufficiently small number of enterprises, industries or groups thereof, further inquiry into the actual

11

use of the subsidy is unnecessary." SAA at 930. However, the statute "does not attempt to provide a precise mathematical formula for determining when the number of enterprises or industries eligible for a subsidy is sufficiently small so as to properly be considered {*de jure*} specific." *Id*. Rather, "Commerce can only make this determination on a case-by-case basis." *Id*. The statute also explains the effect of eligibility requirements on determinations of *de jure* specificity:

> Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law, if:
>
> (I)    eligibility is automatic,
> (II)   the criteria or conditions for eligibility are strictly followed, and
> (III)  the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.
>
> For purposes of this clause, the term "objective criteria or conditions" means criteria or conditions that are neutral and that do not favor one enterprise or industry over another.

19 U.S.C. § 1677(5A)(D)(ii). The SAA further emphasizes that for a subsidy to be non-*de jure* specific, the eligibility criteria must be objective and neutral. *See* SAA at 930.

Moreover, if Commerce determines a subsidy is *de jure* specific then Commerce is not required to undertake a *de facto* specificity analysis. *See PPG Industries, Inc.*, 928 F.2d at 1576 ("{i}f the domestic subsidy is provided by its terms to a particular enterprise or industry or group of enterprises or industries, it is countervailable without further inquiry."); *see also Changzhou Trina Solar Energy Co. v. United States*, 466 F. Supp. 3d 1287, 1302 (Ct. Int'l Trade 2020) ("{o}nce Commerce makes a finding of regional specificity, all enterprises or industries within that region could reasonably be understood to be 'a group of such enterprises or industries,' obviating any purported need for Commerce to make an additional showing that a regional subsidy benefitted a particular industry").

Finally, 19 U.S.C. § 1677(5)(E) provides the standard for determining the existence and amount of a benefit conferred through the provision of a subsidy. Specifically, the statute states, in relevant part, that:

> A benefit shall normally be treated as conferred where there is a benefit to the recipient including – . . . (iv) in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration, and in the case where goods are purchased for more than adequate remuneration.

19 U.S.C. § 1677(5)(E).

## III.   The KETS Constitutes A Countervailable Subsidy

### A. Factual Background

The Korea Emissions Trading System (KETS) was established on January 1, 2015, under the Act on the Allocation and Trading of Greenhouse Gas Emissions Permits (AAGEP), a law that the GOK adopted to reduce greenhouse gas emissions.  *See* Post-Preliminary Decision at 2, Appx 14,329; *see also* GOK NSA QR Part 1 at 40, Appx 10,155.  The KETS is overseen by the Ministry of Environment as well as other ministries and agencies that support its implementation.  *See* Post-Preliminary Decision Appx 14329; *see also* GOK NSA QR Part 1 at 41-42, Appx 10,162-63.  Pursuant to Article 8(1) of the AAGEP, "any entity that emitted at least 125,000 tons of carbon dioxide or equivalents per year over the prior three years or an entity with any one place of operation (*e.g.*, specific plant) that emitted at least 25,000 tons of carbon dioxide or equivalents per year over the prior three years is mandatorily subject to the {KETS}."  *See* Post-Preliminary Decision at 2, Appx 14,329; *see also* GOK NSA QR Part 1 at 40, Appx 10,161.

14

Under the KETS, subject entities must surrender emissions permits, Korean Allowance Units (KAUs), to offset annual emissions of various greenhouse gases.   Post-Preliminary Decision at 3, Appx 14,330.   However, subject companies may also obtain KAUs from the GOK, which calculates and allocates a particular number of KAUs to each subject entity.   *Id.*   The AAGEP provides for various chronological "phases" – with increasing goals for reducing emissions and the number of KAUs available depends on the phase of the program, as well as the number of participants.   *Id.*; *see also* GOK NSA QR Part 1 at 41, Appx 10,162.   Fewer KAUs are allocated in later phases, and participants must calculate the amount of actual emissions over the calendar year, and either surrender KAUs equivalent to the emissions created, or be subject to a penalty.   *Id.*; GOK NSA QR Part 1 at 45-27; Appx 10,140-42.

The POR here fell within phase 2 of the KETS, which covers the years 2018 through 2020.   *Id.*   During phase 2, the GOK began reducing the number of allocated KAUs, with 97 percent of the GOK-calculated annual allotment of KAUs allocated to participants for free.   *Id.*   To determine the allocations under Phase 2, the GOK calculated a

15

benchmark for each entity, generally based on 2014-2016 emissions data submitted by each participant.  *Id.*; s*ee* GOK NSA QR Part 1 at 26, Appx 10,141.  Once the GOK calculated the final number of KAU it would allot to each participant, it set 3 percent of the KAU aside in reserve and allocated 97 percent of the calculated annual allotment to each participant for free.  *Id.*; *see* GOK NSA QR Part 1 at 27, Appx 10,142.  Essentially, the GOK estimated how many KAU each industrial sector emitted based on their 2014-2016 data, and then reserved additional KAUs for new companies and factories, and then provided them with 97% of that amount for no charge, reserving 3% of the KAU for purchase by new companies or factories.  *See* Appx 10,141. The practical result of this is that companies were either required to reduce their emissions by 3%, acquire the additional KAU required, or pay a penalty.

However, the AAGEP, and its accompanying Enforcement Decree, carve out an exception to the 97 percent allocation rule.  Post-Preliminary Decision at 3-4 Appx. 14,330-31.  Entities that qualify for the program are able to receive the full 100 percent allocation of KAU for a specific year, *i.e.,* recapturing the 3 percent typically reserved for

new companies or new factories.  Post-Preliminary Decision at 3-4; *see, e.g.*, GOK NSA QR Part 1 at Exhibit CEP-8, Appx 15,481-15,510. Pursuant to Article 12(4) of the AAGEP and Article 14 of the AAGEP Enforcement Decree, certain businesses (*i.e.*, sectors) that meet certain criteria (*i.e.*, high international trade intensity and/or having high production costs) qualify to receive the entire 100 percent allocation from the GOK each year.  Post-Preliminary Decision at 4; GOK NSA QR Part 1 at 27, 45 and Exhibit CEP-1.

If a company exceeds the amount of freely allocated KAUs for the year, that participant is responsible for acquiring the additional KAUs to make up the difference between the final amount of emissions and the amount of KAUs it received from the GOK.  Post Prelim Determination at 4, Appx. 14,331.  Participants have various options to make up the difference, including:  "(1) banked KAUs carried over from a prior compliance year (subject to certain limits); (2) purchase additional KAUs from other private entities via a centralized KAU trading exchange; (3) purchase additional KAUs directly from other private entities; (4) borrow KAUs from a forthcoming year (subject to certain limits); and/or (5) apply earned credits for certain activities (*e.g.*,

17

external carbon offset programs) intended to reduce greenhouse gas emissions." Post Prelim Determination at 4; GOK NSA SQR1 at 19-20; *see also* GOK NSA SQR2 Part 1 at 3, 5-7 and Exhibit CEP-7.1. However, entities that receive the sectors exemption – receiving a 100 percent allocation –  are not eligible to buy KAUs via the GOK "trading exchange." *Id.* If a participant cannot obtain sufficient KAUs, the GOK may impose a penalty of not more than three times the average market price of KAUs during the compliance year, up to KRW 100,000 per KAU.  Post-Preliminary Decision at 4, Appx 14,331; GOK NSA QR Part 1 at Exhibit CEP-1 Appx 11,682-83.  Conversely, where an entity has an excess of KAUs for a compliance year, it may sell the extra KAUs to other entities (either through the KAU trading exchange or direct sales), or it can carry over a certain percentage of KAUs to the following year.  Post-Preliminary Determination at 4, Appx 14,331-32; *see* GOK NSA QR Part 1 at27 and at Exhibit CEP-1, Appx 101,142, 11,593-94, 11,598-99.

The GOK reported that Hyundai is subject to participating in the KETS under Article 8(1) of the AAGEP as well as Article 14(1) of the AAGEP Enforcement Decree and that it had received KAU allocations

under the KETS.  Post-Preliminary Decision at 5; *see* GOK NSA QR

Part 1 at 51 and Exhibit CEP-1 Appx 11,582-83, 11,638.  Hyundai also

reported participating in the KETS prior to, during, and after the period

of review.  Post-Preliminary Decision at 5, Appx 14,332; *see, e.g.*,

Hyundai Steel NSA Response at 2-9, Appx 11,909-16.

In addition, Article 12(4) of the AAGEP and Article 14 of the

AAGEP Enforcement Decree, set forth which sectors and sub-sectors

qualify for the additional KAU allotment.  Post-Preliminary Decision at

5, Appx 14,332.  The GOK stated that "{t}here is no separate process for

the selection of sector and/or subsectors that may be provided with

additional allocation of permits.  The Ministry of the Environment {}

determines which sectors and/or subsectors meet the criteria under the

relevant law."  Post-Preliminary Decision at 5, Appx 14,332; GOK NSA

SQR1 at 25, Appx 10,140.  Entities automatically qualify for the

additional free KAU allocation if they belong to sectors or sub-sectors

determined by the GOK to be trade intensive and/or high production

cost sectors.  Post-Preliminary Decision at 5, Appx 14,332.

Hyundai reported that it qualified for the full 100 percent

allocation exemption established for sectors with high trade intensity

and/or high production costs because it falls within the sub-sector of Manufacturing of Basic Steel. Post-Preliminary Decision at 5, Appx 14,332; GOK NSA Response 23, Appx. 10, 138; Hyundai Steel NSA Response at 2-9, Appx 11,909-16. Commerce determined that the additional three percent KAU allocation provided to certain industries constitutes a countervailable subsidy. *See* Post-Preliminary Decision at 6, Appx 14,332; *see* IDM at 11-17, Appx 1,047-53. Specifically, Commerce found that, by providing additional emission allocations to certain sectors, the GOK is providing a financial contribution in the form of revenue forgone. Post-Preliminary Decision at 5-6, Appx 14,332-33. Moreover, Commerce found that the provision of additional free KAUs to certain sectors is *de jure* specific, and that a benefit exists because – by virtue of operating in the business sector – the recipient is relieved of the obligation to purchase additional allowances. *Id.*

### B. Commerce's Determination That The KAU Allocation Is A Countervailable Subsidy Is Supported By Substantial Evidence

Plaintiffs argue that Commerce's determination that the GOK's provision of carbon emissions permits to Hyundai and Dongkuk do not constitute a countervailable subsidy. *See* Hyundai Br. at 14-57; *see* Dongkuk Br. at 4. Specifically, Hyundai argues that: (1) the KETS

does not provide a financial contribution because there is no revenue foregone or otherwise due; (2) the KETS does not provide a benefit; and (3) the KETS is not *de jure* specific.  *See* Hyundai Br. at 14-57. However, as explained below, plaintiffs' assertions fail, and the Court should sustain Commerce's final results.

First, Commerce properly determined that the KETS program provides a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(ii) because the GOK foregoes revenue when it allocates the additional 3 percent to certain business sectors at no cost.  Post-Prelim Decision at 5, Appx at 14,332, IDM at 14-15 Appx at 1,050-51.  The Tariff Act defines financial contribution not only as "the direct transfer of funds" but also as "foregoing or not collecting revenue that is <u>otherwise due</u>, such as granting tax credits or deductions from taxable income."  *Gov't of Québec v. United States*, 567 F. Supp. 3d 1273, 1278 (Ct. Int'l Trade 2022) (citing19 U.S.C. § 1677(5)(D)(i)-(ii) (emphasis added)); *Essar Steel, Ltd. v. United States*, 395 F. Supp. 2d 1275, 1277 (Ct. Int'l Trade 2005).

Here, Commerce determined that the GOK relieves companies in certain business sectors, such as Hyundai and Dongkuk, of the financial

burden of purchasing the additional credits – *i.e.*, beyond the standard 97 percent allocation – when it provides the additional three percent KAU allocation at no cost.  Post-Preliminary Decision at 5; Appx. at 14,332.  Because companies receive a baseline of 97 percent of the calculated allotment, the GOK is legally entitled to collect revenue on any additional credits that these entities may need to purchase from the GOK-run trading exchange; the GOK is thus providing something of value on which it could otherwise potentially collect revenue.  Post-Preliminary Decision at 5; Appx. at 14,332.  Commerce's determination that by providing additional free emission permits to certain sectors, the GOK is providing a financial contribution in the form of revenue forgone is supported by substantial evidence.  *See* 19 U.S.C. § 1677(5)(D)(ii).

Plaintiffs nevertheless assert the KETS does not provide a financial contribution because there is no revenue foregone or otherwise due.  *See* Hyundai Br. at 15-33.  Plaintiffs contend that:  (1) Commerce misinterprets unambiguous language of the Tariff Act; (2) Commerce's interpretation of "otherwise due" is unreasonable; and (3) Commerce's

determination that revenue was foregone is not supported by substantial evidence.  *See id.*  Plaintiffs' assertions are misplaced.

Plaintiffs first argue that 19 U.S.C. § 1677(5)(D)(ii) requires that, for a financial contribution to exist, the foregone revenue must be "otherwise" "due" to the government."  Hyundai Br. at 17.  Plaintiffs thus assert "that a financial contribution pursuant to {19 U.S.C. § 1677(5)(D)(ii)} exists only if the GOK had a 'right' to collect revenue from Hyundai Steel and Hyundai Steel would have 'owed' revenue to the GOK as a result of an 'obligation or duty' absent the allocation of permits that it actually received."  Hyundai Br. at 18-19.  Plaintiffs then argue that "under the KETS program there is no expected revenue otherwise due to the GOK because it is unknown at the time the permits are issued whether the recipient will need all of the permits to cover their emission reduction obligations, or whether they will need to purchase additional permits from private parties or through the GOK auction."  Hyundai Br. at 19-20.  Thus, Hyundai and Dongkuk reason that Commerce's interpretation of the statute to find there is a financial contribution is speculative and goes beyond the language in the statute. *See* Hyundai Br. at 20-24.

Plaintiffs assertions are incorrect and belied by the statute. Hyundai automatically received an additional three percent allocation of KAUs, and it is inherently placed into an advantageous position, where it will need to purchase fewer permits than necessary, because of the GOK's involvement.  Though any KAUs required may have been purchased from the GOK or the private market, the GOK is fundamentally "forgoing or not collecting revenue that is otherwise due" by virtue of granting Hyundai an additional three percent.  *See* 19 U.S.C. § 1677(5)(D)(ii).  As Commerce explained, "the baseline companies receiving 97 percent of the calculated allotment are able to purchase from the GOK-run auction, and, therefore, the *GOK is able to collect* revenue on any additional credits that these entities may need to purchase."  Post-Preliminary Decision at 5, Appx 14,332.  Had the GOK treated Hyundai and Dongkuk like any other company, then both plaintiffs would have been eligible to participate in the government run auction where the GOK could have recovered the remaining three percent of permits that Hyundai and Dongkuk needed to purchase to comply with their KETS obligations.  Appx 12,538.  Thus, the GOK is providing something of value on which it could otherwise potentially

24

collect revenue, and the benefit is limited to certain business sectors that include plaintiffs.  Because plaintiffs receive additional permits, the GOK provided a financial contribution in the form of revenue forgone pursuant to 19 U.S.C. § 1677(5)(D)(ii).

Plaintiffs next argue that Commerce's interpretation of "otherwise due" is unreasonable because Commerce may only find a financial contribution in the form of revenue foregone if revenue was, in fact, otherwise due.  Hyundai Br. at 27-29.  Hyundai asserts that there is no "expectation that the GOK could collect revenue from parties that receive the 97 percent allocations because there is no guarantee that an entity's emissions will exceed its allocated cap so that purchase of permits is necessary, and parties who exceed their allocated amounts have the option to borrow or purchase from non-governmental third parties."  Hyundai Br. at 28-29.

However, this assertion overlooks the fact that Hyundai and Dongkuk received a financial contribution before needing to purchase any additional KAUs to maintain compliance with the KETS program. By simply receiving an additional allocation of permits for free, the GOK has overlooked initial revenue it could have received *but for* the

three percent additional allocation. Hyundai and Dongkuk are thus placed into a beneficial position, and either do not need to purchase additional permits or may need to purchase fewer permits to maintain compliance with the KETS program. Regardless of hypotheticals, the GOK forgoes revenue otherwise due had Hyundai and Dongkuk not received the additional three percent and were instead required to purchase additional permits to maintain compliance. Thus, Commerce's interpretation of the phrase "otherwise due" in the statute is reasonable and in accordance with law.

Plaintiffs similarly argue that Commerce impermissibly conflates the analysis of a "financial contribution" under the program with a "benefit." Hyundai Br. at 25. As an initial matter, Commerce does not conflate its benefit finding with its financial contribution finding; indeed, Commerce identifies its reasoning for each individual finding in the IDM. Appx 14,333 (The benefit under this program exists in accordance with 19 C.F.R. § 351.503(b)(2) to the extent that the recipient is relieved of the obligation to purchase additional allowances."); Appx 14,332 ("As such, we preliminarily determine that in providing additional, free emission allocations to certain sectors,

including Hyundai Steel, the GOK is providing a financial contribution in the form of revenue forgone, pursuant to section 771(5)(D)(ii) of the Tariff Act of 1930, as amended (the Act).").  While the statute contemplates a finding of *both* a benefit and a financial contribution to establish the existence of a countervailable subsidy, it does not follow that the two cannot be intertwined.  Indeed, while an entity may receive a benefit that is not financial in nature, a benefit can – and often does – take the form of a financial contribution.  Moreover, that Commerce explained its reasoning by reference to the treatment of other Korean entities does not mean it conflated the statutory terms; rather, Commerce simply sought to explain why it found a countervailable subsidy with reference to the treatment of other Korean entities.  See Appx 1,051.

Finally, plaintiffs argue that Commerce's determination is unsupported by substantial evidence, and contrary to prior determinations.  Hyundai Br. at 29-34.  First, Hyundai cites *Cold-Rolled Steel from Argentina* where Commerce determined that there was no financial contribution in the form of revenue forgone because the Government of Argentina accepted the *only* bid in an auction-based

27

system for committed investments.  *Final Negative Countervailing Duty Determination:  Certain Cold-Rolled Carbon Steel Flat Products From Argentina*, 67 Fed. Reg. 62,106 (Dep't of Commerce Oct. 3, 2002) (*Cold-Rolled Steel from Argentina*) and accompanying IDM at 30-35.  As Commerce explained "where the seller accepts a lower payment than the payment offered by another bidder, we believe that the seller is foregoing revenue."  *Cold-Rolled Steel from Argentina* IDM at 32.  However, the specific evidence on the record of that case indicated that there was only one bidder, and the Government of Argentina therefore accepted the highest bid.  *Id.*  Thus, there was no evidence on that record that the Government of Argentina failed to receive any revenue it was otherwise entitled to recover, because there was no other bidder that would have potentially paid a higher price.  *Id.*

 *Cold-Rolled Steel from Argentina* is inapplicable to the present case because of the nature of the KETS program.  First, the GOK explained that "participants associated with the sectors or sub-sectors that receive additional permits do not participate in the auction."  GOK NSA QR at 29, Appx 10,144.  Accordingly, Hyundai and Dongkuk cannot even participate in the auction process, rendering Hyundai's

analogy misplaced.  In addition, the GOK-managed auctions occur monthly, whereas in *Cold-Rolled Steel from Argentina* there was a singular investment that bidders vied over.  *Cold-Rolled Steel from Argentina* IDM at 30-35.

Hyundai and Dongkuk next cite Commerce's determination in *CWP from Vietnam*, where Commerce found no financial contribution because the Government of Vietnam did not forgo revenue by not collecting duties on the company's imports.  Hyundai Br. at 29-30; *Circular Welded Carbon-Quality Steel Pipe From the Socialist Republic of Vietnam:  Final Negative Countervailing Duty Determination*, 77 Fed. Reg. 64,471 (Dep't of Commerce Oct. 12, 2012) (*CWP from Vietnam*) and accompanying IDM at 13-15.  *CWP From Vietnam* is inapposite.  First, in *CPW from Vietnam*, Commerce was investigating "non-tariff zones," where a designated export processing enterprise's production facilities under Vietnamese law is considered "out of the customs territory of the country," and – as a result – products entering the non-tariff zone are not subject to customs duties of Vietnam.  *CWP from Vietnam* IDM at 13.  Further, Commerce clarified that once goods crossed from the non-tariff zone into the domestic customs territory,

they became subject to duties.  *CWP from Vietnam* IDM at 14.
Plaintiffs reliance on *CWP from Vietnam* is thus misplaced because the
KETS program operates in a completely different manner and the GOK
*does* forego revenue otherwise due because Hyundai and Dongkuk
would be required to purchase additional KAUs but for the GOK
providing additional free permits.  Plaintiffs' reliance on *CWP from
Vietnam* fails.

Finally, plaintiffs argue that Commerce erred by assuming that
any of the additional permits constitute revenue that the GOK would
have otherwise been due because the additional reserve permits have a
multitude of purposes beyond the ability to be purchased and do not
necessarily generate revenue for the GOK.  *See* Hyundai Br. at 30-31.
Hyundai and Dongkuk argue that they purchased all of their additional
permits from private parties, and that, thus, the option to purchase
permits from the GOK does not indicate that the plaintiffs were
obligated to pay the GOK.  Hyundai Br. at 30-33; *see also* Appx 1,051.

However, plaintiffs forget that they received the additional three
percent permits *before* they were required to purchase additional
permits from the private marketplace.  By receiving the additional

30

three percent KAU allocation, the GOK placed Hyundai and Dongkuk into an undeniably advantageous position compared to others business sectors:  the GOK has relieved them of the financial burden of purchasing credits beyond the standard allocation from either the GOK-run auction or the private trading markets.  Post-Preliminary Decision at 5, Appx 14,332.  There is a financial contribution from the GOK to Hyundai and Dongkuk in the form of revenue foregone, specifically the amount the GOK could have collected from plaintiffs if they had been required to purchase additional allowances.  The KAUs that Hyundai and Dongkuk receive have inherent value because they are market instruments with prices established for the purpose of trading both through the GOK-run auction and in private trading markets.  Plaintiffs' reliance on the various options to obtain additional KAUs continues to ignore the initial *additional* 3 percent automatically provided by the GOK.  The additional KAUs constitute a financial contribution that it otherwise due.

### C. The KETS Conferred A Benefit To Hyundai And Dongkuk

Commerce correctly determined that the KETS conferred a benefit to Hyundai and Dongkuk.  As Commerce explained, participants were

relieved of the obligation to purchase additional allowances because the GOK automatically awarded Hyundai and Dongkuk 100 percent KAUs rather than the 97 percent provided to everyone else.  *See* Post-Preliminary Decision at 6, Appx 14,332; IDM at 13, Appx 1,049. Plaintiffs argue that the program does not provide a benefit because: (1) the KETS program instead imposes a burden on *plaintiffs*; and (2) Commerce mistakenly disregarded that burden.  *See* Hyundai Br. at 34-47.  To the contrary, Commerce's determination that the KETS program confers a benefit to plaintiffs is supported by substantial evidence.

First, plaintiffs argue that Commerce's analysis of the KETS program is too focused on the fact that "some subject companies are allocated 100 percent of their assigned permits whereas others are allocated 97 percent," arguing that Commerce should have instead determined that the KETS program imposes a *burden* because "Korean entities that emit over a certain volume of carbon dioxide or equivalents" over a three-year period are "mandatorily subject to the KETS" and "would not otherwise subject themselves to a program that increases their costs."  *See* Hyundai Br. at 37-42.  Thus, plaintiffs assert

32

that "when the program is examined as a whole, it is clear that no benefit can possibly exist from the KET." *Id.*

But plaintiffs' analysis ignores the reality that Hyundai and Dongkuk receive a benefit *compared to other Korean industries* with a lower volume of international trade or production costs.  If every entity received only the standard 97 percent allocation, then there would be no benefit because every entity would be treated the same.  IDM at 13, Appx 1,049.  However, under the program, qualifying entities are granted an additional three percent allocation based on criteria established in the AAGEP; Hyundai and Dongkuk thus receive a benefit under KETS that is not otherwise available to entities receiving the standard 97 percent allocation.  *See id.*  Further, if Hyundai and Dongkuk received only the standard allocation, they would be required to incur a cost for acquiring these credits from either the GOK or private markets.  IDM at 15, Appx 1,046; *see* Appx. 11,910-14.; *see also Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Affirmative Countervailing Duty Determination*, 85 Fed. Reg. 80,011 (Dep't of Commerce Dec. 11, 2020), and accompanying IDM at Comment 10; *see also BGH Edelstahl Siegen GmbH v. United States*,

Ct. No. 21-00080, Slip Op. 22-117 (Ct. Int'l Trade Oct. 12, 2022)

("However, Commerce determines benefit by the reduction or

elimination of the obligation, without regard to the source of that

obligation.") (referencing Countervailing Duties, 63 Fed. Reg. 65,348,

65,361 (Dep't of Commerce Nov. 25, 1998) ("explaining for example that

a subsidy given to offset the cost of new environmental requirements is

nonetheless a countervailable subsidy assuming it is also specific.")).

And of course, the necessary converse is that if either plaintiff

manages to reduce their emissions – the base goal of the program – they

would be able to dispose of the additional KAUs for a profit.  Put

another way, if (hypothetically) under the current program, either

Hyundai or Dongkuk uses only 98% of their anticipated KAUs, they

would be able to dispose of the additional 2%.  If – under the same

circumstances – plaintiffs were treated the same as other entities, they

would be required to *purchase* an additional 1% of KAUs to comply with

the GOK's program.  Indeed, plaintiffs concede that the intent of the

additional 3 percent allocation *is to put recipients into a better position*

vis-à-vis competitors in other countries, stating that the 100 percent

allocation was developed to assist companies "exposed to competition

34

with foreign companies that are not subject to emission caps." Hyundai Br. at 42 n6.

Plaintiffs nevertheless argue that, despite receiving the additional 3 percent, they still had to purchase additional KAUs. *See* Hyundai Br. at 38-30. But this is of no moment: there is no question that plaintiffs were still required to purchase *fewer* KAUs than they would have otherwise needed in order to maintain compliance. *See* Appx. 11,910-16. Indeed, this argument only underscores the fact that – had Hyundai and Dongkuk not received the additional KAUs from the GOK – each would have needed to purchase *even more* additional permits. *Id.* The benefit Hyundai and Dongkuk received therefore eased the "burden" they otherwise would have felt. Commerce's determination that Hyundai and Dongkuk received a benefit is supported by substantial evidence.

Plaintiffs next argue that Commerce disregarded the burden that the KETS imposes because Commerce did not properly consider the effect of the KETS program. Hyundai Br. at 42-47. Hyundai and Dongkuk critique Commerce's citation to the *CVD Preamble*, insisting that the language is inapplicable to the circumstances here. *See*

Hyundai Br. at 43-47.  However, pursuant to 19 U.S.C. § 1677(5)(c),

Commerce examines whether a benefit has been conferred "regardless

of whether the subsidy is provided directly or indirectly on the

manufacture, production, or export of merchandise, *and does not need

to consider the effect of the subsidy in determining whether it exists*."

*See* 19 U.S.C. § 1677(5)(C) (emphasis added).  The statute is thus clear

that Commerce does not take into account the effect of the subsidy, or

any related "burdens" imposed on a firm that are related to the

granting of the subsidy, such as those pertaining to compliance with

certain environmental obligations.  IDM at 11, Appx 1,047.  The statute

also provides that Commerce "treats the imposition of new

environmental requirements and the subsidization of compliance with

those requirements as two separate actions," and "{a} subsidy that

reduces a firm's cost of compliance remains a subsidy (subject, of course,

to the statute's remaining tests for countervailability), even though the

overall effect of the two government actions, taken together, may leave

the firm with higher costs."  *CVD Preamble*, 63 Fed. Reg. at 65,361.

Here, in compliance with its statutory mandate, Commerce

explained that it reviews subsidies independently from other parts of a

law, regulation, or program, to evaluate whether a countervailable

benefit has been conferred, and does not take into account any effects

related to the granting of the subsidy.  IDM at 11, Appx 1,047; *see also*

*CVD Preamble*, 63 Fed. Reg. at 65,361 (Commerce does not consider

"the effects of the subsidy, or any related "burdens" imposed on a firm

that are related to the granting of the subsidy, such as those pertaining

to compliance with certain environmental obligations.").  Commerce's

analysis here is in compliance with the statute, and plaintiffs'

arguments to the contrary fail.

Plaintiffs further contend that Commerce's analogy to the

implementation of new environmental restrictions requiring a firm to

purchase new equipment is inapplicable here because Hyundai and

Dongkuk are not purchasing an input, but are required to increase cost

via the carbon caps implemented.  *See* Hyundai Br. at 43-44.  Plaintiffs

miss the point.  The example used by Commerce in its analysis

illustrates that despite being "burdened" with the implementation of a

new law or regulations by a government, Commerce *does not consider*

*the overarching burden* imposed by that law or regulation.  Rather,

Commerce's analysis focuses on whether the additional three percent

KAU allocation provides a benefit pursuant to 19 U.S.C. § 1677(5)(C), not the general burden imposed on all entities by the KETS program. As Commerce explained, "{w}hether the KETS program covers all entities within a country or not and whether the program results in a burden that not all Korean companies must shoulder is not the focus of our analysis and such an evaluation is not required under the CVD law. Rather, our analysis examines whether a subsidy has been conferred to a select group of companies under the KETS law and implementing rules."  IDM at 12, Appx 1,048.

Plaintiffs next assert that "{t}he relative allocation of permits…which represents the cap on its emissions, does not benefit" them because they have "not paid less for inputs or earned more revenues than {they} would have otherwise as required pursuant to 19 C.F.R. § 351.503(b). . . ."  Hyundai Br. at 46-47.  To the contrary, as Commerce explained, the additional 3 percent allocation of KAUs relieves the recipient of the obligation to purchase additional KAUs. Post-Preliminary Decision at 6, Appx 14,332.  However, that plaintiffs experience some burden from the program in general does not mean that they do not *also* experience less burden than entities that do not

38

qualify for the program.  Rather, because Hyundai and Dongkuk automatically receive an additional three percent allocation of KAUs from the GOK, they are positioned favorably to either purchase no additional KAUs (*i.e.,* if they used exactly 100% percent or less) or purchase fewer additional KAUs (*i.e.,* if they exceed the 100 percent of allotted permits).  In either situation, plaintiffs' obligations to comply with the KETS program are lessened and they receive a substantive benefit.

Indeed, evidence on the record demonstrates that Hyundai and Dongkuk ultimately had to purchase additional KAUs in order to surrender the requisite number of KAUs to the GOK.  *See* Appx. 11,910-14.  Had it not been for the additional 3 percent allocation, Hyundai and Dongkuk would have needed to purchase even more KAUs in order to ensure they complied with the KETS requirements. Plaintiffs' assertion that they received no benefit because the program ultimately resulted in less revenue overall fails.

### D. The KETS Program Is Specific

Finally, Commerce determined the KETS program is *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i) because the AAGEP and

implementing rules contain criteria that determines which entities automatically qualify for the additional three percent KAU allocation. IDM at 16 Appx 1,052; Post-Preliminary Decision at 5, Appx 14,332. Hyundai and Dongkuk nevertheless contend that the KETS program is not specific because: (1) it does not meet the specificity criteria under 19 U.S.C. § 1677(5A)(D)(i); and (2) the program does meet the requirements of the safe harbor provision pursuant to 19 U.S.C. § 1677(5A)(D)(ii). Hyundai Br. at 47-57.

Hyundai and Dongkuk first argue that Article 12(4) of the AAGEP and Article 14 of the AAGEP Enforcement Decree do not "explicitly limit" treatment "to a specific enterprise or industry" as required to be *de jure* specific, citing to this Court's decision in *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*. Hyundai Br. at 48-54 (citing *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 523 F. Supp. 3d 1393 (Ct. Int'l Trade 2021) (*ASEMESA*)). To the contrary, *ASEMESA* does not detract from Commerce's determination.

In *ASEMESA*, Commerce reviewed the European Union's (EU) Common Agricultural Policy and determined the program was *de jure*

specific because subsidies were provided to Spanish olive growers

through the Basic Payment Scheme.  523 F. Supp. 3d at 1399.[2]  Because

portions of the Basic Payment Scheme subsidy program were based on

past iterations of EU subsidy programs, Commerce traced the history of

these program to a separate program and payment system from 1997,

which provided an annual grant to Spanish olive growers.  *Id.*  That

original payment system was replaced in 2003 by the Separate Payment

Program, which provided subsidies to those Spanish olive growers that

both meet the eligibility requirements and apply for subsidies.  *Id.*  In

2015, the Separate Payment Program was in turn replaced by the Basic

Payment Scheme program, which relied on data collected by the

original programs but allocated "subsidy payments using regional rates

based on the "productive potential" and "productive orientation" of a

particular region."  *Id.*  Further, the rate assigned to participating

farmers did not vary with the type and volume of crop produced, but did

account for historically produced crops like olives.  *Id.*  Commerce

---

[2] This Court recently upheld Commerce's second redetermination finding that the subsidies received by the Spanish olive industry were instead *de facto* specific.  *See Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, Court No. 18-00195, Slip Op. 22-108 (Ct. Int'l Trade September 14, 2022).

concluded that the annual grant under Basic Payment Scheme was crop-specific because the grant amounts received by olive growers under the program were related to industry-specific amounts received under the original 1997 program, and thus was *de jure* specific. *Id.*

This Court held that Commerce erred in its *de jure* specificity analysis because "there {was} no uniform treatment across the agricultural sector in the provision of benefits." *ASEMESA,* 523 F. Supp. 3d at 1403. The Court also determined it was inappropriate that "the legislation underlying the subsidy under consideration {} merely reference{d} and incorporate{d} prior legislation which itself may favor a specific sector." *Id.* (internal quotation marks omitted). Rather, the Court concluded that "{u}nder the plain meaning of Section 1677(5A), subsidies are only *de jure* specific where the authority providing the current subsidy, or its operating legislation, directly and explicitly prescribes limitations on the distribution of subsidies to an enterprise or industry." *Id.* at 1404.

Hyundai and Dongkuk's reliance on *ASEMESA* is misplaced. First, Commerce is not interpreting previous iterations or the historical evolution of the AAGEP; rather, the AAGEP still operates in the same

42

fashion as when it was established on January 1, 2015. Further, Article 12(4) of the AAGEP and Article 14 of the AAGEP Enforcement Decree establish criteria that *expressly limits* which entities qualify for the additional allocation by setting thresholds that they must meet to qualify. IDM at 16, Appx 1,052. Specifically, article 12(4) of the AAGEP provides that "all emission permits may be allocated gratuitously to a business entity eligible for allocation, if its international trade intensity is higher than the standard prescribed by {AAGEP Enforcement Decree} or if it engages in a type of business for which the production cost increased by reducing greenhouse gases is not less than the standard prescribed by {AAGEP Enforcement Decree}." *See* Appx 11,585-87. Article 14 of the AAGEP Enforcement Decree further states that "the types of business eligible for gratuitous allocation of all emissions permits…shall be any of the following types of businesses… (1) a business with an international trade intensity of at least 30 percent, (2) a type of business with production costs of at least 30 percent or (3) a type of business with an international trade intensity of at least 10 percent and production costs of at least 5 percent." IDM at 16, Appx 1,052 (internal quotes omitted); *see also* Appx 11,638.

43

Thus, a participant who does not meet that criteria because they are a business with low international trade intensity or low production costs is *explicitly* ineligible.

Moreover, plaintiffs' interpretation of *ASEMESA* and its comparison to the present case are overly broad. Hyundai asserts that because the AAGEP does not explicitly refer to steel producers, the program cannot be *de jure* specific. Hyundai Br. at 51-52. However, that characterization fails to consider that the law inherently limits the subsidy to large businesses with high international trade intensity or high production costs. Moreover, the Korean Ministry of Environment determines which sectors and/or subsectors meet the criteria under the relevant law, and has determined that "Manufacturing of Basic Steel," plaintiffs' classification, qualifies for the full 100 percent allocation exception. Post-Prelim Decision at 5, Appx 14,332. Hyundai and Dongkuk's reliance on ASESMA is misplaced.

Plaintiffs further argue that the KETS program cannot be *de jure* specific since the GOK itself was unaware of the precise entities or subsectors to which the permit allocations would ultimately apply. Hyundai Br. at 52-53. But the statute does not require Commerce to

44

consider the *intent* behind the subsidy, but the *result*. *See* 19 U.S.C.

§ 1677(5A)(D)(i); *see also* SAA at 930 (""{t}he *de jure* prong of the

specificity test recognizes that where a foreign government *expressly*

*limits* access to a subsidy to a sufficiently small number of enterprises,

industries or groups thereof, further inquiry into the actual use of the

subsidy is unnecessary."). In addition, Article 12(4) of the AAGEP

Article 14 of its Enforcement Decree "delineate{} the criteria for

determining which sectors and sub-sectors qualify for the additional

KAU allotment" and companies that fall within the "sectors and sub-

sectors that the GOK determined as trade intensive and/or high

production cost sectors automatically qualify for the additional free

three precent {sic} KAU allocation from the GOK." Post-Preliminary

Decision at 5, Appx 14,332. Thus, the AAGEP and the implementing

rules identify and provide conditions that limit eligibility to select

industries that can meet the criteria, with one of the criteria being

volume of international trade.

Finally, Hyundai and Dongkuk assert that the AAGEP and the

implementing rules meets the requirements of the safe harbor provision

pursuant to 19 U.S.C. § 1677(5A)(D)(ii). Hyundai Br. at 54-57. That

provision provides that a program is not specific where the authority or legislation creating the program "establishes objective criteria or conditions governing the eligibility for" *and* "eligibility is automatic," "the criteria or conditions for eligibility are strictly followed," and "the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification." 19 U.S.C. § 1677(5A)(D)(ii).  The provision defines the term "objective criteria or conditions" as "criteria or conditions that are neutral and that *do not favor one enterprise or industry* over another."  *Id.* (emphasis added).

Plaintiffs argue that eligibility for the program is automatic because an entity is "assigned permits if (i) it has a 'trade intensity' of thirty percent; (ii) its production costs are at least thirty percent; or (iii) it has a 'trade intensity' of at least ten percent and production costs that are at least five percent."  Hyundai Br. at 55.  But this assertion is flawed because a business must meet the exceptional standards under the AAGEP and implementing rules to qualify as a business with high trade intensity.  Section 1677(5A)(D)(ii) specifically states that "{w}here the authority providing the subsidy, or the legislation pursuant to

46

which the authority operates, establishes *objective* criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law" 19 U.S.C. § 1677(5A)(D)(ii).  As Commerce explained, the AAGEP and its implementing rules are not objective because they establish criteria that favor industries that can meet the high prerequisites.  *See* Appx. 1052.  As Commerce explained in *Silicon Metals from Australia*, "the criteria governing the eligibility on accessing the subsidy must be neutral and must not favor one enterprise or industry over another." *Silicon Metal from Australia: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 9,834 (March 8, 2018) (*Silicon Metal from Australia*), and accompanying IDM at *20*.  In *Silicon Metal from Australia*, Commerce determined that the criteria used by the government of Australia was not neutral because "the criteria favor enterprises or industries that conduct 'emission-intensive' activities and are 'trade-exposed' over industries or enterprises that do not conduct such activities and are not trade exposed which thus constitutes an explicit limitation on access to the subsidy." *Silicon Metals from Australia IDM* at 20-21.

47

The same is true here.  As Commerce explained, the KETS program is limited to certain sectors that have high international trade intensity and/or high production costs, with those sectors qualifying for support beyond that received by other companies participating in the program.  *See* IDM at 16, Appx 1,052.  Thus, Hyundai and Dongkuk's argument that eligibility is automatic, the criteria are strictly followed, and the criteria are clear are of no moment because the KETS program is not objective to begin with.  *See* Hyundai Br. at 54-57.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's determination and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICA M. McCarthy
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

48

OF COUNSEL:                                    /s/ Kelly A. Krystyniak
Jared M. Cynamon                               KELLY A. KRYSTYNIAK
Attorney                                       Trial Attorney
Office of the Chief Counsel                    Commercial Litigation Branch
  for Trade Enforcement and               Civil Division
Compliance                                     Department of Justice
U.S. Department of Commerce                    P.O. Box 480
Washington, D.C.                               Ben Franklin Station
Tel: (202) 482-0131                            Washington, D.C.  20044
                                               Telephone: (202) 514-8640
                                               Email: Kelly.A.Krystyniak@usdoj.gov


Dated November 1, 2022                         *Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the word-count limitation, in that it contains 9280 words according to the word-count function of the word-processing software used to prepare the memorandum, including text, footnotes, and headings.

<u>/s/ Kelly A. Krystyniak</u>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of November, 2022, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to counsel of record.

<u>/s/ Kelly A. Krystyniak</u>